**Dennis J. TURNBULL, Plaintiff,**

v.

**UNITED STATES of America, Defendant–Counter Plaintiff–Appellee,**

v.

**Johnny FOSTER, Counter Defendant–Appellant.**

**No. 90–1213.**

United States Court of Appeals, Fifth Circuit.

April 22, 1991.

Rehearing Denied May 23, 1991.

David L. Hooper, Abilene, Tex., for Turnbull.

Marvin Collins, U.S. Atty., Dallas, Tex., for the U.S.

Gilbert S. Rothenberg, Gary R. Allen, Chief Appellate Section, Tax Div., Kevin M. Brown, Washington D.C., for Foster.

Before GOLDBERG, JOLLY and WIENER, Circuit Judges.

GOLDBERG, Circuit Judge:

In November 1985, the Internal Revenue Service (the "IRS") assessed Johnny Foster and Dennis J. Turnbull $214,270.37 in unpaid payroll taxes for all four quarters in 1981. In 1987 Turnbull paid one hundred dollars in partial satisfaction of the IRS assessment and then filed this action seeking a refund. The government counterclaimed against Foster and Turnbull to recover the balance of the assessments levied against them. The jury found Foster liable as a responsible party who willfully failed to pay unpaid payroll taxes. The district court denied Foster's motion for a new trial, finding that the jury's verdict was not against the weight of the evidence and Foster appeals. Foster claims that the jury's verdict finding him a responsible party who willfully failed to pay DJT Management, Inc.'s ("DJT") 1981 payroll taxes is against the great weight of the evidence. We disagree and therefore affirm the district court.

## I. FACTS AND PROCEEDINGS BELOW

In December 1978, Foster, Turnbull, and Ray B. King formed Big Sky Joint Venture ("Big Sky") for the purpose of operating facilities for mentally retarded patients. The State of Texas placed patients in these facilities and paid Big Sky for the cost of their care. Sometime prior to July 1980,[1] Turnbull organized DJT, a Texas corporation whose sole stockholders were Turnbull and his wife. DJT served as the financial arm of Big Sky; it performed all of the accounting functions for Big Sky, obtained financing for Big Sky, received state funds for housing the patients, and paid all Big Sky's bills, including payroll. Like all employers, DJT was required to withhold federal income and social security taxes from the wages of its employees, and to pay those taxes periodically to the United States.

Foster served as DJT's president throughout 1980 and for at least a portion of 1981. He was responsible for managing, hiring, and firing all of DJT's and Big Sky's key personnel. He was also responsible for both entities' budgets, and had the final authority in determining which creditors were paid and in what order.

In 1980 Foster learned that DJT had not paid its payroll taxes, and on January 8, 1981, he signed a check on DJT's behalf to the IRS to cover the overdue taxes. Foster testified at trial that this episode with the IRS had greatly upset him as "you could go to jail or they could shut us down for that type of stuff." Turnbull then apparently assured Foster that he would ensure that DJT's payroll taxes were promptly paid in the future.

Foster testified at trial that he resigned as president of DJT in February 1981. Turnbull disputes this testimony, claiming Foster never resigned as president of DJT. In support of his position, Turnbull points to two letters dated May 5, 1981, addressed to the Texas Department of Human Resources, which Foster signed in his capacity as the president of DJT. Regardless, Foster's duties at DJT did not apparently change after February 1981, when he allegedly resigned as president of DJT. Foster continued to manage DJT's and Big Sky's employees throughout 1981.

It is unclear from the record when Foster learned that DJT had failed to pay its 1981 payroll taxes. Turnbull testified that he told Foster in April 1981, and then again in July 1981, that DJT had an outstanding payroll tax liability. Foster contends that he did not learn of DJT's unpaid payroll

---

1. Turnbull apparently had no interest in Big Sky after July 1980.

taxes until October 1981 when an IRS officer called and notified him of the liability. Foster's testimony was supported by King, another Big Sky partner, and by a second Big Sky employee.

Despite the fact that Foster maintains that he did not learn that the 1981 payroll taxes had not been paid until October 1981, Foster conceded at trial that sometime after August 1981 he entered into a verbal agreement with the IRS to pay $10,000 per month towards reducing this payroll tax liability. Foster subsequently failed to fulfill this agreement. Turnbull testified that on October 20, 1981, Foster informed him that he had restructured the payment plan with the IRS and that he would need money to repay the outstanding payroll taxes. On November 2, 1981, Foster wrote Turnbull, explaining that a portion of the state funds paying Big Sky for patient care were needed to repay the outstanding payroll taxes.

In the summer of 1981, Foster instructed the state to send the Big Sky checks directly to Big Sky, instead of sending them to DJT. Foster then opened a new bank account for Big Sky. Foster continued to write checks on the new account for DJT's payroll expenses. In August 1981, Foster moved out of DJT offices to a new location. The government contends that throughout each of the quarters of 1981, Foster authorized the payment of net payroll and other creditors, while the payroll taxes were left unpaid. Indeed, in December 1981 Foster directed that Big Sky send a check to DJT, specifying that only specific employees were to be paid. Foster admits that he told DJT employees to pay the payroll first, but maintains that everyone understood the term "payroll" to include payroll taxes.

In November 1985, the IRS assessed Foster and Turnbull $214,270.37 in unpaid payroll taxes for all four quarters of 1981. This assessment represented the one hundred percent penalty available under 26 U.S.C. Section 6672.[2] In April 1987, Turnbull paid $100 in partial satisfaction of the penalty and filed this action, seeking a refund of the amount paid. The government counterclaimed against Turnbull and Foster to recover the balance of the assessments levied against them.

At the conclusion of the trial, the jury found that Foster, but not Turnbull, was a "responsible person" for payment of DJT's employment taxes and that he willfully failed to account for and pay such taxes. After the district court entered judgment on the jury verdict, the United States filed a JNOV motion against Turnbull, which the district court granted. The district court denied, however, Foster's motion for a new trial. Foster then filed a timely notice of appeal from "the Order of the Court denying Motion for New Trial...."

## II. DISCUSSION

### A. *Jurisdiction*

■ Initially, this court must determine whether Foster's appeal from the district court's denial of his motion for a new trial, rather than from the final judgment, renders his appeal jurisdictionally defective under Federal Rule of Appellate Procedure 3(c). This court may determine, *sua sponte*, whether it has jurisdiction over Foster's appeal. *MCG, Inc. v. Great W. Energy Corp.*, 896 F.2d 170, 173 (5th Cir. 1990). It is well settled that although an order denying new trial is reviewable, it is not appealable; appeal should be taken from the final judgment instead. *Osterberger v. Relocation Realty Serv. Corp.*, 921 F.2d 72, 73 (5th Cir.1991).

Under Rule 3(c), a notice of appeal "shall specify the party or parties taking the appeal" and "shall designate the judgment, order or part thereof appealed from." Foster filed a timely notice of appeal from "the Order of the Court denying Motion for New Trial...." Consequently, the notice of appeal filed by Foster did not "designate the judgment ... appealed from," i.e., the final judgment. *See* Fed.R.App.P. 3(c).

In past decisions, however, this court has liberally construed Rule 3(c), holding that "where the intent to appeal an unnamed or

---

**2.** Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.

mislabeled ruling is apparent and there is no prejudice to the adverse party," the appeal is not jurisdictionally defective. Fed.R.App.P. 3(c). This circuit's treatment of technically deficient notices of appeal is in accord with the Supreme Court's decision in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In *Foman*, the Supreme Court held that an appeal from a denial of a motion to vacate and amend a judgment "should have [then] treated ... as an effective, although inept, attempt to appeal from the judgment sought to be vacated." *Foman*, 371 U.S. at 181, 83 S.Ct. at 229. Therefore, relying on *Foman*, this court has rendered numerous decisions concluding that so long as the failure to designate the judgment appealed from did not mislead or prejudice the responding party, the appellant did not forfeit his right of appeal.[3]

Recently, however, the Supreme Court held that failure to comply with Rule 3(c) by failing to include a party's name was a jurisdictional bar to appeal. *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 2408, 101 L.Ed.2d 285 (1988). In *Torres*, the name of one of the sixteen intervening plaintiffs was inadvertently omitted in the notice of appeal. *Id.*, 108 S.Ct. at 2407. According to the Court, permitting an appeal by an unnamed litigant was tantamount to waiving Rule 3(c); therefore, it was irrelevant whether there was a clear intent to appeal or whether an opposing party was prejudiced as a result of the omission. *Id.* at 2408–09.

■ The *Torres* Court did not, however, view its decision as inconsistent with its decision in *Foman*. The Court distinguished *Foman* on the grounds that it dealt with the judgment-designation provision rather than the party-specification provision of Rule 3(c) and because *Foman* merely forgave a technical noncompliance with Rule 3(c). *Id.*, 108 S.Ct. at 2408. As the Court explained, "[w]e do not dispute the important principle for which *Foman* stands—that the requirements of the rules of procedure should be liberally construed and that 'mere technicalities' should not stand in the way of consideration of a case on its merits." *Torres*, 108 S.Ct. at 2408. Therefore, a notice that substantially complies with the rules may bestow jurisdiction over an appeal. *Id.* at 2408–09.

After *Torres*, this court had to address the issue of whether the failure to properly designate the judgment being appealed from will amount to a jurisdictional defect or whether that failure can be excused as a mere technicality. Repeatedly this court has adhered to its previous rule that a mistake in designating a judgment appealed from should not bar an appeal as long as the intent to appeal a specific judgment can be fairly inferred and the appellee is not prejudiced or misled by the mistake. For example, in *Warfield v. Fidelity & Deposit Co.*, 904 F.2d 322, 325 (5th Cir. 1990), we cited both *Foman* and *Torres* for the proposition that "[d]efects in the judgment specified in the notice of appeal are treated somewhat more liberally than defects in specifying the parties taking the appeal." In another recent case, this court cited *Torres* as authority for the conclusion that "[f]ailure to properly designate the order appealed from is not a jurisdictional defect, and may be cured by an indication of intent in the briefs or otherwise." *United States v. Rochester*, 898 F.2d 971, 976 n. 1 (5th Cir.1990).[4]

**3.** *See, e.g., Incas & Monterey Printing & Packaging, Ltd. v. M/V Sang Jin*, 747 F.2d 958, 963 n. 15 (5th Cir.1984) (Rule 3(c) requirement that notice of appeal designate judgment not to be strictly construed so as to defeat an appeal where overriding intent to appeal was clear.); *see also C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1056 (5th Cir.) (court should liberally construe a notice of appeal which fails to designate the correct judgment appealed from where the intent to appeal an unmentioned or mislabeled ruling is apparent and there is no prejudice to the adverse party),

cert. denied, 454 U.S. 1125, 102 S.Ct. 974, 71 L.Ed.2d 112 (1981).

**4.** *See also Birdsong v. Wrotenbery*, 901 F.2d 1270, 1272 (5th Cir.1990) ("court may accept a notice of appeal which 'substantially' complies with the technical requirements of Rule 3(c) or is the 'functional equivalent' of a notice of appeal"); *McLemore v. Landry*, 898 F.2d 996, 999 (5th Cir.) (although party's notice did not designate judgment appealed from, intent to appeal from underlying summary judgment and denial of its motion to file a compulsory counterclaim

■ In this case, the United States, as the appellee, did not initially object to Foster's appeal on jurisdictional grounds. Indeed, the United States concedes in its supplemental brief that it was not prejudiced or misled by Foster's technically imperfect notice of appeal. Furthermore, both parties briefed issues encompassing the underlying judgment and not just the district court's denial of Foster's motion for a new trial. Therefore, we hold that Foster's notice of appeal is sufficient to invoke this court's jurisdiction.

### B. *Payroll Taxes*

The Internal Revenue Code requires employers to withhold federal income and social security taxes from their employees' wages. 26 U.S.C. § 3102, 3402. These funds are held in trust for the United States. 26 U.S.C. § 7501(a). If these trust funds are not then paid over to the United States, section 6672(a)[5] of the Code imposes a penalty[6] equal to the unpaid taxes on any person required to collect, account for, and pay over the withheld taxes, who willfully fails to do so. *Gustin v. United States*, 876 F.2d 485, 491 (5th Cir.1989). Thus, liability for the section 6672 penalty is established if the person is a "responsible person" who "willfully" fails to pay over the withheld taxes. *Id.*

### 1. Responsible Person

■ Foster claims that the jury verdict holding that he was a responsible person under section 6672(a) was against the great weight of the evidence and therefore the district court erred in denying his motion for a new trial. This court reviews the denial of a motion for a new trial for an abuse of discretion. *See Deloach v. Delchamps, Inc.*, 897 F.2d 815, 820 (5th Cir. 1990).

■ Whether Foster is a responsible person under section 6672(a) turns on his status, duty, and authority. *See Wood v. United States*, 808 F.2d 411, 415 (5th Cir. 1987). This circuit has generally taken a broad view of who qualifies as a responsible person under section 6672(a). *Id.* The crucial inquiry is whether the individual had the effective power to pay the taxes. *Howard v. United States*, 711 F.2d 729, 734 (5th Cir.1983). Therefore, this statute applies to *all* responsible persons, not just to the *most* responsible person. *Id.* at 737.

■ This court considers the following factors when determining who is a responsible person: (1) holding an office or owning stock in the corporation; (2) managing the day-to-day operations of the business; (3) making decisions as to disbursement of funds and payment of creditors; and (4) check-signing authority. *See, e.g., Howard*, 711 F.2d at 734; *Neckles v. United States*, 579 F.2d 938, 940 (5th Cir.1978) (person involved in organization of corporation, who was regarded by some as "boss," and who signed checks and had significant control over disbursement of corporate funds, was a "responsible person").

■ Although Foster apparently concedes that there is evidence that he was a

---

was gleaned from its timing and status of case when notice was filed, and from statement of issues and briefs), *cert. denied,* — U.S. —, 111 S.Ct. 428, 112 L.Ed.2d 412 (1990); *Cf. FTC v. Hughes,* 891 F.2d 589, 590 (5th Cir.1990) (although recognizing that *Torres* permits the liberal interpretation of Rule 3(c), court refused to permit appeal where litigant noticed a judgment from which he was not permitted to appeal).

**5.** Section 6672(a) provides in pertinent part:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment

thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

**6.** Although denominated a "penalty," the liability imposed by section 6672 is not penal in nature since it "brings to the government only the same amount to which it was entitled by way of the tax." *Newsome v. United States*, 431 F.2d 742, 745 (5th Cir.1970). In other words, the government only collects the taxes due, not both the taxes due and an additional penalty equal to the amount of the taxes. Therefore, section 6672 "is simply a means of ensuring that the tax which is unquestionably owed the Government is paid.'" *Id.* (quoting *Botta v. Scanlon*, 314 F.2d 392, 393 (2nd Cir.1963)).

responsible person under section 6672(a) for the first and second quarters of 1981, he insists he was not a responsible party for the third and fourth quarters. Foster notes that in August 1981 he moved his office to another location and alleges that he subsequently had little contact with DJT. Foster maintains that he did not have sufficient control of DJT to procure payment of its third and fourth quarter taxes and was therefore not a responsible person.

We find, however, that the location of Foster's office does not determine whether he was a "responsible party." The evidence indicated that even after Foster moved his office, his responsibilities at DJT did not significantly change. The DJT employees still perceived Foster as the "boss" during this period. In addition, although Foster maintains he resigned as president of DJT in February 1981, on May 5, 1981, he signed two letters to the Texas Department of Human Resources in his capacity as president of DJT.

Additionally, Foster had the authority to sign checks on DJT's accounts throughout 1981, even though the last check he apparently signed on this account was dated August 1981. Foster also signed checks on Big Sky's accounts made out to DJT so that DJT could pay their joint expenses, including payroll. Indeed, in December 1981 Foster directed that Big Sky send a check to DJT, specifying that only specific employees were to be paid. Moreover, Turnbull argued in his own defense at trial that to his knowledge Foster met with IRS agents in August and October to arrange for payment of back payroll taxes. Although Foster disputes this testimony, the jury was entitled to weigh Turnbull's credibility and infer that Foster at least had authority at that time to enter into such an agreement.

It is apparent from the record that the jury was presented with sufficient evidence from which to conclude that Foster was a responsible party during the relevant time period. Foster's check signing authority and ability to negotiate a settlement with the IRS indicate that Foster had the ability

to effect payment of the payroll taxes throughout 1981. Therefore, the district court's denial of Foster's motion for a new trial was not an abuse of discretion.

### 2. Willfulness

As stated earlier, section 6672(a) only imposes liability on a responsible person if that person "willfully" failed to collect, account for, or pay over the withheld employment taxes. Under this statute, willfulness requires a voluntary, conscious, and intentional act, but not necessarily a bad motive or evil intent. *Gustin*, 876 F.2d at 492. The government normally proves willfulness through evidence that the responsible person paid other creditors with knowledge that payroll taxes were due at the time to the United States. *Id.; see also Wood*, 808 F.2d at 415. Willfulness also encompasses reckless disregard of a known or obvious risk that trust funds would not be paid over to the United States. *See, e.g., Mazo v. United States*, 591 F.2d 1151, 1154 (5th Cir.) (reckless disregard includes failure to investigate or to correct mismanagement after being notified that taxes were due), *cert. denied*, 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979).

Foster argues that he could not have willfully failed to pay DJT's employment taxes unless he knew the taxes were unpaid. He contends that the government did not present evidence to the jury that he knew of the unpaid taxes before October 1981, during the fourth quarter of 1981. Since Foster maintains that he was only a responsible party during the first two quarters of 1981, and he did not know that the taxes had not been paid until October, he argues that he cannot be held liable under section 6672(a) for any of the unpaid taxes in 1981 because he was never both a responsible party and one who willfully failed to pay DJT's taxes. Foster argues that the district court therefore erred in failing to grant his motion for new trial because the jury verdict on his willfulness was against the great weight of the evidence.

Foster's argument fails for several reasons. First, we have determined that

Foster was a responsible person for all four quarters of 1981. Therefore, the government did not have to prove that he knew about the unpaid taxes before October 1981 in order to hold Foster liable for willfully failing to pay the taxes for all four quarters of 1981. Even if the trust funds for the other quarters had already been dissipated by the time Foster learned that DJT had not paid the payroll taxes for the previous quarters, Foster nevertheless had a duty to apply any available unencumbered funds to reduce the payroll tax liability. *See Mazo*, 591 F.2d at 1154.

In addition, there was evidence in the record that Turnbull informed Foster of the unpaid taxes as early as April 1981 and again in August 1981. Even though Foster disputes this testimony, the jury was entitled to credit it. Moreover, there was also disputed testimony in the record that Foster met with IRS agents in August of 1981 and reached an agreement regarding the payment of the past due payroll taxes.

Evidence was introduced at trial indicating that Foster paid other creditors with knowledge that the payroll taxes were due. For example, after Foster relocated his office, he did in fact send money from Big Sky to DJT to pay DJT's expenses, but this money was apparently never enough to pay all outstanding expenses plus payroll taxes. Foster testified that throughout 1981 he authorized checks to pay other DJT expenses, including outstanding loans, lease obligations, and utilities. In addition, in December 1981, after Foster concedes that he knew about the payroll tax deficiency, Foster directed Big Sky to send a payroll check to DJT, with instructions that DJT only pay certain employees.

■ Even if Foster did not knowingly pay other DJT creditors, the government argues that Foster was nevertheless liable for the payroll taxes because he knew he could not rely on Turnbull to pay the taxes. Turnbull had demonstrated his unreliability when he failed to pay the 1980 payroll taxes. This court has clearly stated that the willfulness requirement is satisfied if a responsible person acts with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government. *Gustin*, 876 F.2d at 492. Thus, Foster acted with reckless disregard when he delegated this duty to Turnbull and failed to take independent action to procure payment of the taxes. *See Mazo*, 591 F.2d at 1155 (delegation of duty to pay payroll taxes does not release responsible party from this obligation).

■ In summary, there is sufficient evidence in the record to support the jury's finding that Foster willfully withheld payment of taxes in each quarter of 1981. Whether the jury found Foster liable on the theory that he paid other creditors with knowledge that taxes were due, or on the theory that Foster acted with reckless disregard of a known or obvious risk that taxes would not be paid, the finding was not against the great weight of the evidence. Therefore, the district court's denial of Foster's motion for a new trial was not an abuse of discretion.

■ Finally, Foster argues that the jury verdict in favor of Turnbull and against Foster demonstrated such jury confusion that the district court should have granted a new trial to prevent a serious miscarriage of justice. Foster postulates that the jury only issued a verdict against him because "someone had to pay up." In support of this claim, Foster relies on an assortment of distinguishable cases.[7] In this case, the record is replete with evidence that supports the jury verdict; nothing in the record indicates that the district court's refusal to grant a new trial resulted in any miscarriage of justice. Therefore,

---

7. *See Lucas v. American Mfg. Co.*, 630 F.2d 291 (5th Cir.1980) (new trial granted where jury's verdict awarded less than one-half of plaintiff's stipulated out-of-pocket costs and, due to approaching hurricane, court gave jury fifteen minutes to reach a verdict); *Wood v. Holiday Inns*, 508 F.2d 167 (5th Cir.1975) (new trial granted where jury awarded differing amounts of damages against joint tortfeasors whose respective liability resulted from a single act); *Hatfield v. Seaboard Air Line R.R.*, 396 F.2d 721 (5th Cir.1968) (court granted new trial where a jury found the defendant liable for plaintiff's substantial injuries, but only awarded one dollar in damages).

the district court did not abuse its discretion when it failed to grant a new trial.

## III. CONCLUSION

For the above-stated reasons, we AFFIRM.